EISBRENNER, V. BURNS HARGIS,

(Caption continued on next page)

## PLAINTIFF DOLEZAL FAMILY LIMITED PARTNERSHIP'S
## MOTION TO CONSOLIDATE CASES AND TO APPOINT
## LEAD COUNSEL STRUCTURE WITH MEMORANDUM OF LAW IN SUPPORT

DOLEZAL FAMILY LIMITED
PARTNERSHIP,
Derivatively On Behalf Of
CHESAPEAKE ENERGY CORP.,

              Plaintiff,

v.

AUBREY K. McCLENDON, RICHARD

K. DAVIDSON, KATHLEEN M.

Civil Action No. 5:12-cv-00477-F

COMES NOW, the Dolezal Family Limited Partnership ("Dolezal"), and moves the

Court for an order: (1) consolidating the above-captioned shareholder derivative actions

(collectively the "Actions"), as well as any subsequently filed, related action(s), for all purposes,

including pretrial proceedings and trial, pursuant to Fed. R. Civ. P. 42; (2) appointing Harwood

Feffer LLP ("Harwood Feffer") as lead counsel; and (3) appointing The Law Offices of

Delluomo & Crow as liaison counsel.

## I. INTRODUCTION

The above captioned Actions were filed by shareholders of Chesapeake Energy Corporation (the "Company" or "Chesapeake") derivatively on behalf of the Company. Each alleges that the officers and directors of Chesapeake breached their fiduciary duties to the Company and its shareholders and each seeks redress for breaches of fiduciary duty and abuse of control. All three of the Actions allege that demand upon Chesapeake's Board of Directors (the "Board") was futile and therefore excused.

Due to this substantial overlap of common issues of fact and law, the similarity of the defendants named in each of the Actions, and in the interests of efficiency and judicial economy, Plaintiff Dolezal seeks an order formally consolidating the Actions and appointing a leadership structure for the consolidated action. In making this request, Plaintiff follows the guidance of the *Manual for Complex Litigation* (4th ed. 2011) ("*Manual*") and submit for the Court's approval a Proposed Consolidation Order, which provides for the consolidation of these related actions; establishes efficient procedures for the filing and docketing of papers; proposes an organization of Plaintiffs' counsel; and otherwise eliminates wasteful and duplicative litigation.

## II. BACKGROUND

Chesapeake explores for and produces natural gas. ¶ 1. It owns interests in approximately 45,700 natural gas and oil-producing wells. ¶ 14. Defendant Aubrey K. McClendon ("McClendon") has served as the Company"s Chief Executive Officer ("CEO") and Chairman of the Board since he co-founded Chesapeake in 1993. ¶ 15.

Throughout his employment with Chesapeake, Defendant McClendon participated in the Company's Founders Well Participation ("FWPP"), which permitted him to participate in all of the wells drilled by or on behalf of Chesapeake during each fiscal year. ¶¶ 29-30. The current

version of the FWPP was approved by shareholders for a ten year period in 2005.  ¶ 3.  Under the FWPP, McClendon may obtain up to a 2.5% stake in all wells Chesapeake drills in a given year, and in return, McClendon is required to pay his share of costs related to drilling.  *Id.*

On April 18, 2012, it was reported that McClendon and entities controlled by him, have taken on approximately $1.4 billion debt to finance his obligations under the FWPP.  ¶ 6.  One of the primary lenders of the $1.4 billion was a private equity firm called EIG Global Energy Partners ("EIG").  *Id.*  At the same time that EIG was extending this massive amount of credit to McClendon, it was engaged in the purchase of billions of dollars' worth of assets from Chesapeake.  *Id.*  As a result of this arrangement McClendon had an incentive to influence the EIG transactions with Chesapeake to EIG's benefit so that EIG would continue to provide him large amounts of credit.  *Id.*  The Company failed to disclose this conflict publicly and the Board failed to prevent the conflict from occurring.  *Id.*

Also on April 18, 2012, it was reported that McClendon has used his stake in the FWPP as collateral for those same loans.  *Id.*  The terms of McClendon's credit require him to give all profit from the FWPP wells financed by EIG until it has achieved a 13% annualized return, after which it takes 42% of the profit while the remaining 58% belongs to McClendon.  ¶ 58.  As a result, in order to generate enough revenue to pay EIG its 13% annualized return and still generate income for himself from the wells, McClendon has an incentive to direct the Company to continue producing more gas at any cost.  ¶ 8.  However, there is currently an over-supply of natural gas in the United States, and the Company its shareholders could be better served in some situations by decreasing gas production in order to restrict supply.  *Id.*  However, regardless of the benefit to the Company and shareholders of capping production, McClendon needs to maintain production high.  *Id.*

Additionally, due to his financing arrangements, McClendon was competing against the Company in the credit market for oil and gas financing.  ¶ 9.  Chesapeake is a highly leveraged Company that needs access to the credit markets on the best terms possible.  *Id.*  However, be securing over $1 billion in loans for use in Chesapeake projects, in terms more favorable to the lender than Chesapeake would have provided, McClendon was directly competing against the Company for access to a substantial amount financing.  *Id.*

This was not the first time that McClendon's large debts have presented conflicts whereby his loyalties were divided.  In 2008, McClendon was forced to sell almost all of a nearly 5.5% equity stake in Chesapeake at once after a margin call.  ¶ 4.  By selling hundreds of millions of dollars' worth of stock at once into a falling market, McClendon substantially harmed the Company's share price and nearly bankrupted himself.  *Id.*  Then, shortly after the margin-call debacle, McClendon convinced the Board to pay him $12.1 million for an antique map and also authorized a one-time incentive payment to him of $75 million.  *Id.*  The foregoing occurred during a year in which Chesapeake common stock had fallen over 75% in value.  *Id.*

As a result of the events of 2008, the Board has been on notice that: (i) McClendon has a propensity to manipulate the Board to his own benefit to the detriment of the Company and its shareholders; (ii) the Company's controls over conflicts of interest were deficient; and (iii) due to skepticism in the market about the intentions and credibility of the Company's management, any transactions with even an appearance of a conflict of interest needed to be sufficiently supervised and disclosed.  ¶ 5.

On April 19, 2012, the Deborah G. Mallow IRA SEP Investment Plan filed a Shareholder's Direct and Derivative Complaint alleging violations of the Federal Proxy Laws and Breach of Fiduciary Duties.  On April 20, 2012, Christopher Snyder filed a Shareholder's

Direct and Derivative Complaint alleging violations of the Federal Proxy Laws and Breach of Fiduciary Duties.  On April 30, 2012, the Dolezal Family Limited Partnership filed a Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty and Abuse of Control.

All three Actions allege that the Board of Directors breached their fiduciary duties by permitting McClendon's conflicts of interest to occur and by failing to disclose them.   Given the substantial overlap of factual and legal issues arising from the above-alleged conduct, the Actions should be consolidated.

## III. DISCUSSION

### A. Consolidation Pursuant to Fed. R. Civ. P. 42(a) is Appropriate.

Consolidation of the Actions is appropriate because each of the Actions arise from similar allegations against similar defendants involving common questions of law and fact.  FED R. CIV. P. 42(a).  Consolidation achieves convenience and economy in the administration of justice where complaints contain similar allegations, the relief sought is substantially the same, and the evidence would be similar in both cases.  *Resnik v. Woertz*, 774 F. Supp. 2d 614, 624-625 (D. Del. 2011); *In re Comverse Tech., Inc. Derivative Litig.*, 2006 U.S. Dist. LEXIS 94235, at *6-8 (E.D.N.Y. Sept. 22, 2006).  In this case, the facts and law support consolidation of the above-captioned actions.  The central issues in each action are the same – namely, whether the Board's conduct in permitting the conflicts of interest created by McClendon's financing of his FWPP interests constituted a breach of the fiduciary duties owed to Chesapeake and its shareholders. *Sklar v. Bank of Am. Corp.*, 258 F.R.D. 260, 271-272 (S.D.N.Y. 2009) (noting "[d]ifferences in causes of action, defendants, or the class period do not render consolidation inappropriate if the cases present sufficiently common questions of fact and law, and the differences do not outweigh the interests of judicial economy served by consolidation.")

(internal citation omitted).   Here, consolidation would not prejudice any of the parties and, indeed, consolidation is the most effective way of resolving these parallel litigations.   Plaintiffs submit herewith a proposed order granting this motion (the "Proposed Order"), which provides that the files of the Actions shall be maintained in one file under Master Case No. 5:12-cv-00436.  If the Court grants this motion, every pleading filed in the consolidated action shall bear the following caption:

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| IN RE CHESAPEAKE ENERGY | ) | Case No. 5:2012-cv-00436 |
| SHAREHOLDER | ) | |
| DERIVATIVE LITIGATION | ) | Relating to: |
| | ) | [                              ] |

Further, the Proposed Order also provides for consolidation of any future case(s) brought on behalf of Chesapeake shareholders arising from the events described in the complaints which are filed in, removed to or transferred to this Court and alleging that demand upon the Board was wrongfully rejected or ignored.  Among their other duties, Proposed Lead Counsel shall work to ensure that counsel in any subsequently filed action that properly belongs as part of *In re Chesapeake Shareholder Derivative Litigation* receives notice of the Proposed Order.

**B.**     **The Court Should Appoint the Harwood Feffer LLP as Lead Counsel**

The Proposed Order implements the procedures suggested by the *Manual* for complex, multi-party cases such as the Actions by designating co-lead counsel.  *See Manual* § 10.22; *Sklar*, 258 F.R.D. at 271-272 ("While not statutorily required, the appointment of interim class counsel [in derivative actions] may be helpful in 'clarify[ing] responsibility for protecting the

interests of the class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, and negotiating settlement.'"). Plaintiffs respectfully submit that designating lead counsel will promote the orderly progress of the Actions and ensure that they are prosecuted in an efficient and coordinated fashion. In selecting lead counsel, the "guiding principle" is who will "best serve the interest of the plaintiffs." *Millman v. Brinkley*, 2004 U.S. Dist. LEXIS 20113, *9 (N.D. Ga. Oct. 1, 2004).

Here, Harwood Feffer is well qualified to serve as lead counsel. Harwood Feffer has demonstrated a commitment to diligently and vigorously litigating the Actions on behalf of all Plaintiffs. And as demonstrated below, Harwood Feffer is well versed in the unique challenges posed by class actions, in general, and shareholder derivative litigation, specifically. The appointment of the Harwood Feffer will advance the consolidated case in an orderly and efficient manner.

As suggested by the *Manual*, upon entry of the Proposed Order, Proposed Lead Counsel will be responsible for the day-to-day conduct of the litigation and for carrying out the Orders of the Court concerning the conduct of the litigation. Specifically, Proposed Lead Counsel will be:

> charged with formulating (in consultation with other counsel) and presenting positions on substantive and procedural issues during the litigation . . . presenting written and oral arguments and suggestions to the court, working with opposing counsel in developing and implementing a litigation plan, initiating and organizing discovery requests and responses, conducting the principal examination of deponents, employing experts, arranging for support services, and seeing that schedules are met.

*See Manual* at § 10.221. Proposed Lead Counsel is also charged with responsibility for monitoring the time and expenses of all plaintiffs' counsel to ensure that this litigation is conducted efficiently and without duplication. *See* Proposed Order at ¶4; *see also Manual* §

10.221.  The Proposed Order specifically lists Co-lead Counsel's responsibilities.  *Id.*

As stated in the *Manual,* in determining who should serve as lead counsel, the Court should conduct an independent review to ensure that counsel appointed to leading roles are qualified and responsible, that they will fairly and adequately represent all of the parties on their side, and that their charges will be reasonable.  *Id.* at § 10.224.  Indeed, the most important factor is "achieving efficiency and economy without jeopardizing fairness to parties."  *Id.* at § 10.221.  Here, the appointment of Harwood Feffer would advance the goals of the litigation and the benefit the parties.

Accordingly, Plaintiffs respectfully request consolidation of the related actions captioned above and appointment of the Proposed Lead Counsel.

### 1.  Plaintiff's Proposed Lead Counsel Has Demonstrated A Commitment To Identifying And Investigating Potential Claims In The Actions.

Proposed Lead Counsel, on behalf of its client, has demonstrated a firm commitment to vigorously and effectively prosecuting this lawsuit.  *Sklar*, 258 F.R.D. at 31 (considering "the work counsel has done in identifying or investigating potential claims in the action" when appointing co-lead counsel in derivative action).  Harwood Feffer filed a comprehensive and original complaint articulating multiple theories for breach of fiduciary duties.  The other two earlier filed complaints, by contrast, are substantially the same and fail to identify certain aspects of the wrongdoing detailed in the Dolezal Complaint.  Moreover, the Dolezal Complaint, at great than 45 pages, provides much more detailed allegations, both with respect to the facts and to demand futility, than the earlier filed complaints that are 16 and 18 pages, respectively.  Further, the Dolezal Complaint explains the numerous conflicts among the Chesapeake Board of Directors that would render pre-suit demand futile.

Relying on their extensive experience in bringing and pursuing derivative claims such as

those asserted here, Harwood Feffer fully understands the substantial investment of time and resources necessary to properly pursue and lead the Actions, and are committed to making the necessary investment in the Actions.

> **2. Harwood Feffer Has Experience In Complex Shareholder Litigation, Has Experience In Litigating The Types Of Claims Asserted In The Actions, And Has Knowledge Of The Law Applicable In The Actions.**

Courts generally consider counsels' experience and expertise in determining whether to appoint class counsel. *See, e.g.*, *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) (explaining that the "most persuasive" factor in choosing lead counsel may be proposed counsel's "experience in, and knowledge of, the applicable law in this field"); *Sklar*, 258 F.R.D. at 31. Here, Harwood Feffer is extremely qualified to serve as co-lead counsel in the Actions.

Harwood Feffer has a sterling reputation in the field of shareholder litigation, and its principals have been involved in some of the most successful shareholder derivative actions in the United States, including cases involving situations where a company's board of directors and executive officers breached their fiduciary duties to the company and its shareholders. *See* Firm Resume of Harwood Feffer, attached as Exhibit A to the Declaration of Matthew M. Houston ("Houston Declaration") filed contemporaneously herewith. Accordingly, Harwood Feffer is clearly capable and well-suited to serve as Lead Counsel in these complex stockholder derivative Actions.

In addition to its substantive experience, Harwood Feffer possesses the financial resources, and the demonstrated willingness to invest such resources, necessary to litigate this

complex derivative matter vigorously and effectively on behalf of Chesapeake and its shareholders.  Harwood Feffer, therefore, is well qualified to serve as co-lead counsel in this action.

### 3.    The Law Offices of Delluomo & Crow Should Be Appointed as Liaison         Counsel

This Court should also appoint The Law Offices of Delluomo & Crow as Liaison Counsel.  As Liaison Counsel, The Law Offices of Delluomo & Crow will be primarily responsible for communicating with the Court and with other counsel, and in the coordination and prosecution of this complex litigation.  *See Manual* § 10.221.

The Law Offices of Delluomo & Crow is well suited for this role as a local attorney with extensive and complex litigation experience as is demonstrated by its form resume annexed to the Houston Declaration.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff Dolezal respectfully requests the Court enter the Proposed Order consolidating the related actions and appointing Harwood Feffer as Lead Counsel.

Submitted this 30th day of April, 2012.

By: s/Steven W. Crow
LAW OFFICES OF DELLUOMO & CROW
5617 N. Classen Blvd.
Oklahoma City, OK 73118
405-843-0400
405-843-5005 (fax)

ROBERT I. HARWOOD
MATTHEW M. HOUSTON
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022

(212) 935-7400

Attorneys for The Dolezal Family Limited
Partnership