IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

_____

| | |
|---|---|
| (1) DOLEZAL FAMILY LIMITED PARTNERSHIP, Derivatively on Behalf of Nominal Defendant CHESAPEAKE ENERGY CORP., )<br>)<br>)<br>)<br>)<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>(1) AUBREY K. McCLENDON, )<br>(2) RICHARD K. DAVIDSON, )<br>(3) KATHLEEN M. EISBRENNER, )<br>(4) V. BURNS HARGIS, (5)FRANK )<br>KEATING, (6)CHARLES T. MAXWELL, )<br>(7) MERRILL A. MILLER, JR., (8)DON L. )<br>NICKLES, and (9)LOUIS A. SIMPSON, )<br>)<br>)<br>Defendants, )<br>)<br>and )<br>)<br>(1) CHESAPEAKE ENERGY CORP., )<br>)<br>Nominal Defendant. )<br>_____) | No. CIV-12-477-F |

**SHAREHOLDER DERIVATIVE COMPLAINT FOR
BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL**

Plaintiff, Dolezal Family Limited Partnership ("Plaintiff"), by and through its undersigned

attorneys, brings this derivative complaint (     the "Complaint") against the defendants named

herein, for the benefit of nominal defendant, Chesapeake Energy Corp. ("Chesapeake" or the "

Company"), against certain members of its Board of Directors (the "Board") and certain of its

executive officers seeking to remedy defendants' breaches of fiduciary duties and abuse of control.

## NATURE AND SUMMARY OF THE ACTION

1.      Chesapeake is one of the largest producers of natural gas in the United States. The Company's business primarily consists of obtaining access to land under which it believes it will find natural gas and/or oil and drilling to access and exploit oil and gas reserves.

2.      Defendant McClendon (defined herein) is a co-founder of the Company and has served as Chief Executive for many years.  McClendon has consistently been the recipient of very generous and unorthodox compensation benefits from the Company.

3.      One such compensation scheme is the Founders Well Participation Program (" FWPP").  The FWPP has been in existence since approximately 1993.  In 2005, the FWPP was approved for a ten year period by the Company's shareholders.  The FWPP permits McClendon to obtain up to a 2.5% stake in all wells that the Company drills in a given year.  In return, McClendon must pay his share of drilling related costs.

4.      In 2008, McClendon owned approximately 5.5% of the Company's outstanding stock.  He had purchased much of this stock on margin.  When the financial crisis was at its deepest in October 2008, due to margin calls, McClendon was forced to sell hundreds of millions of dollars of Company stock at once, destabilizing the Company's share price, creating speculation that it was a takeover candidate and nearly bankrupting himself.  Inexplicably, later in the same year, a year in which Chesapeake's common stock had lost approximately 75% of its value, the Chesapeake Board: (i) approved a one-time incentive payment to McClendon of $75 million due to his purportedly extraordinary services rendered; and (ii) purchased McClendon's

antique map collection for $12.1 million.  The Company was subsequently sued by shareholders and, among other things, was forced to rescind the expensive map collection.

5.      As a result, of the foregoing the members of the Board were on notice that: (i) McClendon had a propensity to manipulate the Board to his own benefit and to the harm of the Company's shareholders; (ii) the Company's controls over conflicts of interest were deficient; and (iii) due to skepticism in the market about the intentions and credibility of the Company's management, any transactions with even the appearance of a conflict of interest needed to be sufficiently supervised and disclosed.

6.      However, in the years since 2008, the Board has permitted McClendon to engage in transactions that even further diverge from the interests of the Company's shareholders and pose substantial risks to the Company.  On April 18, 2012, it was reported that McClendon and entities he controls have taken out approximately $1.4 billion in debt to finance his obligations under the FWPP, and that he has used his stake in the FWPP as collateral for those loans. Moreover, one of the primary lenders of the $1.4 billion is a private equity firm called EIG Global Energy Partners ("EIG") that was simultaneously purchasing billions of dollars in assets from Chesapeake.

7.      Although the Company disclosed the asset sales in which EIG participated, it did not disclose that McClendon was obtaining billions of dollars' worth of personal loans from EIG at the same time.  The conflicts of interest raised by this arrangement are substantial: McClendon had an incentive to give EIG better terms than were in the interest of the Company's shareholders.

8.      However, there are additional conflicts created by McClendon's financing arrangements that are not related to EIG's asset purchases.  In order to generate the revenue to

make his loan payments, McClendon has an incentive to direct the Company to continue producing more gas at any cost. However, there is currently an over-supply of natural gas in the United States caused by the shale boom, and as a result, the Company and shareholders could be better served in some circumstances by decreasing gas production. Regardless of the benefit to the Company and the shareholders of capping production, it is in McClendon's interests to maintain production high. This renders McClendon unable to fairly judge whether capping or limiting gas production would be in the benefit of the Company.

9.      Additionally, Chesapeake is a very highly leveraged Company and needs access to the credit markets on beneficial terms. As the Company has acknowledged, there are a limited number of entities and consortiums providing financing to the energy industry on the scale of McClendon's loans. At present, Chesapeake has long-term indebtedness of approximately $10 billion. Thus, $1 billion in credit is not an insignificant sum to the Company. Nonetheless, the Board permitted a conflict to occur wherein McClendon was competing with the Company to access financing to be used in drilling the Company's own wells.

10.      As detailed herein, the members of the Board of breached their fiduciary duties by, among other things: (i) approving transactions with entities that were simultaneously engaged in massive personal financing transactions with McClendon; (ii) permitting McClendon to continue serving as CEO although he was obviously conflicted; (iii) allowing a compensation structure whereby McClendon's interests diverged substantially from those of the Company's shareholders; (iv) permitting McClendon to compete with the Company for access to the credit markets; and (v) failing to disclose the foregoing.

## JURISDICTION AND VENUE

4

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.   Plaintiff is a Nevada limited partnership, and no defendant is a citizen of that state.   This Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367(a).

12.     Venue is proper in this Court because Chesapeake maintains executive offices in this District, a portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### A.  Plaintiff

13.     Plaintiff is, and was at all times relevant hereto, an owner and holder of Chesapeake common stock.

### B.  Defendants

14.     Nominal defendant Chesapeake is a corporation incorporated under the laws of the State of Oklahoma, which maintains its principal executive offices at 6100 North Western Avenue, Oklahoma City, Oklahoma.   According to its public filings, Chesapeake is the second largest producer of natural gas, a top 15 producer of oil and natural gas liquids, and the most active driller of new wells in the United States.   The Company owns interests in approximately 45,700 active natural gas and oil wells that currently produce approximately 3.5 billion cubic feet of natural gas equivalent per day.

15.     Aubrey K. McClendon ("McClendon") is a co-founder and Chief Executive Officer

5

("CEO") and Chairman of the Board of Chesapeake.

16.    Richard K. Davidson ("Davidson") has served as a director of Chesapeake since 2006.  Davidson is a member of the Audit Committee.

17.    Kathleen M. Eisbrenner ("Eisbrenner") has served as a director of Chesapeake since 2010.  Eisbrenner is a member of the Compensation Committee.

18.    V. Burns Hargis ("Hargis") has served as a director of Chesapeake since 2008. Hargis is the Chair of the Audit Committee.

19.    Frank Keating ("Keating") has served as a director of Chesapeake since 2003. Keating is the Chair of the Compensation Committee.

20.    Charles T. Maxwell ("Maxwell") has served as a director of Chesapeake since 2002.  Maxwell is a member of the Compensation Committee.

21.    Merrill A. Miller, Jr. ("Miller") has served as a director of Chesapeake since 2007. Miller is a member of the Audit Committee.

22.    Don L. Nickles ("Nickles") has served as a director of Chesapeake since 2005. Nickles is the Chair of the Nominating and Corporate Governance Committee.

23.    Louis A. Simpson ("Simpson") has served as a director of Chesapeake since 2011. Simpson is a member of the Nominating and Corporate Governance Committee.

24.    The defendants referenced in ¶¶ 15-23 shall be collectively referred to herein as the "Individual Defendants."

## DEFENDANTS' DUTIES

25.    By reason of their positions as officers, directors, and/or fiduciaries of Chesapeake and because of their ability to control the business and corporate affairs of Chesapeake,

Defendants owed Chesapeake and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Chesapeake in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Chesapeake and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Chesapeake and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

26. Defendants, because of their positions of control and authority as directors and/or officers of Chesapeake, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Chesapeake, each of the Defendants had knowledge of material non-public information regarding the Company.

27. To discharge their duties, the officers and directors of Chesapeake were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Chesapeake were required to, among other things:

    a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    c. Exercise good faith to ensure that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles (" GAAP");

    d. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence

## SUBSTANTIVE ALLEGATIONS

28.     Chesapeake engages in the acquisition, exploration, development and production of natural gas an oil properties in the United States.

29.     According to the Company, ever since its Initial Public Offering ("IPO") in February 1993, Chesapeake has offered an incentive program called the Founder Well Participation Program to its two founders, defendant McClendon and Tom L. Ward ("Ward"), "to continue participating as working interest owners in the wells that the Company drills in the future ."

30.     On April 29, 2005, the Company filed a Proxy statement in advance of the Company's annual meeting of shareholders to be held on Friday June 10, 2005.  Among other things, the Company asked shareholders to reapprove the FWPP for an additional ten years.  The Proxy described the terms of the program as follows:

- The Founders will be permitted to participate in all of the wells spudded by or on behalf of the Company during each fiscal year. This mandatory participation period is longer than the current quarterly election period and we believe is less favorable to the Founders since they are committing for a longer participation period. The participation period after termination of employment other than for cause or a change of control has been shortened from a fixed five years to the period that the Founder is subject to any covenant not to compete in favor of the Company (currently six months under their employment agreements). Upon approval of the Program by shareholders, the Founders will be eligible to participate in the Program for

8

the period of July 1, 2005 through December 31, 2005 by notifying the Committee on or about June 10, 2005 of their election to participate. Beginning with the 2006 fiscal year, the Founders will make annual participation elections no later than 30 calendar days prior to the start of each fiscal year.

- A participation election by each of the Founders may not exceed a 2.5% working interest in a well and is not effective for any well where the Company's working interest, after elections by the Founders to participate, would be reduced to below 12.5%. These provisions are the same as the current participation program.

- The Founders may not participate in (i) any well in which the Company owns an interest and has not elected to participate as a working interest owner with respect to such interest; (ii) any well which constitutes a re-entry of an existing producing well; (iii) any well drilled in a multi-unit secondary or tertiary recovery unit in which the Founders do not already have a working interest by virtue of participation in a well or well(s) that have been combined into the unit; and (iv) any other wells which the Company reasonably determines the Founders should not participate in given the objectives of the Founder Well Participation Program. These provisions are essentially the same as the current participation program.

- Once a Founder elects to participate, the percentage cannot be adjusted during the fiscal year without the prior written consent of the Compensation Committee. These provisions are the same as the current participation program. No such adjustment has ever been requested or granted.

- For each well in which a Founder participates, the Company will bill the Founder, on a monthly basis, an amount equal to the Founder's participation percentage multiplied by the drilling and operating costs incurred in drilling the well. Leasehold costs associated with each new well will be billed in the first invoice for the well based on an amount determined by the Company to approximate the Company's average cost in the Company's pool of acreage. Payment is due for all such costs promptly upon receipt of an invoice. These provisions are essentially the same as the current participation program.

- The right to participate under the Program will terminate, with respect to each Founder, on the earlier of (i) the Founder's death; (ii) termination of the Founder for cause; or (iii) the expiration of any covenants not to compete, in the event of termination for any other reason.

31.     The Company's shareholders voted to approve the Program for ten years at the June 10, 2005 shareholders meeting.

32.     On February 10, 2006, Ward retired from the Company and as a result, his participation in the FWPP was terminated on August 10, 2006.

33.     On March 14, 2006, the Company filed its annual report for 2005 on Form 10-K with the SEC, disclosing that the Company had long-term indebtedness of approximately $5.5 billion.  Among other things, with respect to the FWPP, the 10-K disclosed:

**Disclosures About Effects of Transactions with Related Parties**

As of December 31, 2005, we had accrued accounts receivable from our two co-founders, CEO Aubrey K. McClendon and former COO, Tom L. Ward, of $6.4 million and $6.4 million, respectively, representing joint interest billings from December 2005 which were invoiced and paid in January 2006.

34.     On April 28, 2006, the Company filed its Proxy Statement in advance of the 2006 meeting of shareholders.  The Proxy disclosed that the Audit Committee was responsible for the " Review insider or affiliated party transactions or courses of dealing and related disclosures in the Corporation's annual proxy statement (excluding transactions pursuant to plans approved by the Board)."  Additionally, the Proxy disclosed:

**Report of the Compensation Committee on Executive Compensation**

*Our Philosophy*. We are responsible for establishing the Company's compensation policies and monitoring the implementation of the Company's compensation system for its executives. Our objective is to develop an executive compensation system that is competitive with the Company's peers **and encourages both short-term and long-term performance aligned with shareholders' interests**.

\* \* \*

… We consider the following to be key factors in our determination of executive compensation:

10

*… **Compensation should be closely aligned with shareholder interests**.*

\* \* \*

*Compensation of the Chief Executive Officer*. The compensation of our chief executive officer, who is the principal executive officer of the Company, is determined in the same manner as the compensation for other executive officers of the Company. The CEO's current employment agreement, entered into effective July 1, 2005, provides for a minimum annual base salary of $950,000 which represents an 8.0% increase over his year-end 2004 salary of $880,000. In addition , his 2005 cash bonuses represented an increase of 18% over 2004 levels. The cash bonuses and restricted stock granted to our CEO were based on the subjective evaluation of the Company's growth and profitability and the contributions of our CEO to that growth. We determined that the increase in overall compensation for the CEO during 2005 was appropriate given the Company's strong performance in 2005…

\* \* \*

**Founder Well Participation Program**

…The FWPP fosters and promotes the development and execution of the Company's business by: (a) retaining and motivating the principal executive officers who founded the Company; (b) *aligning the financial rewards and risks of the founders with the Company more effectively than overriding royalty, carried interest or other performance incentive programs maintained by many of the Company's peers; and (c) imposing on the founders the same risk incurred by the Company in its core operations*.

The FWPP is administered and interpreted by the Compensation Committee of the Board. In addition, the Board, in its sole discretion, may take any action with respect to the FWPP that would otherwise be the responsibility of or delegated to the Compensation Committee. The Board of Directors has the right to suspend or terminate the FWPP after December 31, 2015 by providing written notice of termination to the founders one year before the effective date of such termination…

\* \* \*

Notwithstanding anything to the contrary, in each case the founder's participation in a Program Well will be on no better terms than the terms agreed to by unaffiliated third party participants in connection with the participation in such

11

Program Well or similar wells operated by the Company Entities.

35.     On March 1, 2007, the Company filed its annual report for 2006 on Form 10-K with the SEC and disclosed that as of December 31, 2006, the Company had long-term indebtedness of approximately $7.4 billion.  Additionally, the 10-K stated:

**Disclosures About Effects of Transactions with Related Parties**

As of December 31, 2006, we had accrued accounts receivable from our CEO, Aubrey K. McClendon, of $11.1 million representing joint interest billings from December 2006 which were invoiced and paid in January 2007.

36.     On April 30, 2007, the Company filed its Proxy Statement in advance of the 2007 meeting of shareholders.  Among other things, the Proxy disclosed:

**Compensation Committee**

The Compensation Committee is responsible for establishing the Company's compensation policies and monitoring the implementation of the Company's compensation system for its executives. ***The Committee's objective is to develop an executive compensation system that encourages both short-term and long-term performance aligned with shareholders' interests*** and is competitive with the Company's peers.

\* \* \*

*Executive Officer Compensation*. Mr. McClendon together with Mr. Rowland are responsible for analyzing, developing and recommending base salary adjustments, cash bonuses and restricted stock awards with respect to the Executive Officers, ***including themselves***, for review, discussion and approval by the Committee at its regularly scheduled meetings in June and December of each year

\* \* \*

**Compensation Discussion and Analysis**

***The goal for our executive compensation system is to encourage both short-term and long-term performance aligned with shareholders' interests***. In establishing executive compensation, our objective is to attract, retain and motivate executive officers and key employees with the competence, knowledge and experience to promote the growth and profitability of the Company.

* * *

As the chief executive officer and a founder of the Company, Mr. McClendon has been instrumental in shaping the vision for the Company and transforming it into a leader in U.S. natural gas production. Accordingly, his compensation is predominantly awarded in the form of long-term equity incentives. *As a significant shareholder, Mr. McClendon has a major portion of his personal wealth tied directly to sustained stock price appreciation and performance, providing direct alignment with shareholder interests*.

The company provides Mr. McClendon with certain perquisites *specifically designed to provide him with the flexibility to focus on the myriad of critical and complex issues that currently face the U.S. natural gas industry while remaining involved in the oversight of the day-to-day management of the Company*.

The FWPP fosters and promotes the development and execution of the Company's business by: (a) retaining and motivating our chief executive officer who founded the Company; (b) *aligning the financial rewards and risks of Mr. McClendon with the Company more effectively and directly than other performance incentive programs maintained by many of the Company's peers; and (c) imposing on Mr. McClendon the same risks incurred by the Company in its exploration and production operations*.

* * *

**Policy on Transactions with Related Persons**

The Company has adopted a written policy and procedures for the Audit Committee's review of any transaction, arrangement or relationship or series of similar transactions, arrangements or relationships (including any indebtedness or guarantee of indebtedness) in which (1) the aggregate amount involved will or may be expected to exceed $100,000 in any calendar year, (2) the Company is a participant, and (3) its directors, executive officers, and greater than 5% shareholders and their immediate family members have or will have a direct or indirect interest (other than solely as a result of being a director or beneficially owning less than 10% of the equity of another entity, excluding a partnership). *The Audit Committee approves or ratifies only those transactions that it determines in good faith are in, or are not inconsistent with, the best interests of the Company and its shareholders*. Each of the related person transactions described below has been approved or ratified in accordance with this policy.

*The Audit Committee reviews and assesses ongoing relationships with a related person on at least an annual basis to see that they are in compliance with the*

13

*policy and remain appropriate.* The Audit Committee has reviewed and pre-approved certain transactions even if the amount involved exceeds $100,000. Transactions that have standing pre-approval under the policy include the Company's employment of executive officers and immediate family members if the Compensation Committee has approved the person's compensation, joint operating agreement services if the related person is subject to the same terms applicable to all working interest owners and Mr. McClendon's participation in the FWPP (which is overseen by the Compensation Committee).

**Founder Well Participation Program**

… As discussed in "Compensation Discussion and Analysis," *the Company believes the FWPP fosters and promotes the development and execution of the Company's business.*

\* \* \*

*The right to participate in the FWPP can only be assigned by Mr. McClendon to an affiliate designated as such in accordance with the FWPP.*

\* \* \*

Notwithstanding anything to the contrary, in each case Mr. McClendon's participation in a well will be on no better terms than the terms agreed to by unaffiliated third party participants in connection with the participation in such well or similar wells operated by the Company.

From January 1, 2006 to December 31, 2006, the Company billed Mr. McClendon $106,177,855… for [his] share of leasehold, drilling, completion, equipping and operating costs. [Mr.] McClendon… paid each invoice promptly upon receipt. During the three months ended March 31, 2007, the Company billed Mr. McClendon $36,603,774… for such costs. There was no amount owing… for joint interest billing invoices at any month-end in 2006 or 2007.  (Emphasis added).

37.    On February 29, 2008, the Company filed its annual report for 2007 on Form 10-K with the SEC and disclosed that as of December 31, 2007, the Company had long-term indebtedness of approximately $10.950 billion, which represented 47% of Chesapeake's total book capitalization at that date.  Additionally, the 10-K stated:

**Disclosures About Effects of Transactions with Related Parties**

14

As of December 31, 2007, we had accrued accounts receivable from our CEO, Aubrey K. McClendon, of $18 million representing joint interest billings from December 2007 which were invoiced and timely paid in January 2008.

38.      On April 29, 2008, Chesapeake filed its Proxy Statement with the SEC in advance

of the 2008 meeting of shareholders.  Among other things, the Proxy stated:

**Compensation Committee**

The Compensation Committee is responsible for establishing the Company's compensation policies and monitoring the implementation of the Company's compensation system for its executives. ***The Committee's objective is to develop an executive compensation system that encourages both short-term and long-term performance aligned with shareholders' interests*** and is competitive with the Company's peers.

* * *

Executive Officer Compensation. Mr. McClendon and Mr. Rowland are responsible for analyzing, developing and recommending base salary adjustments, cash bonuses and restricted stock awards with respect to the executive officers, ***including themselves***, for review, discussion and approval by the Compensation Committee at its regularly scheduled meetings in June and December of each year.

* * *

**Compensation Discussion and Analysis**

* * *

The goal for our compensation system is to encourage both short-term and long-term performance that is aligned with shareholders' interests. When we set compensation, our objective is to attract, retain and motivate employees with the competence, knowledge and experience to promote the growth and profitability of the Company.

* * *

During its June 2008 review of executive compensation, the Compensation Committee intends to thoroughly review, again, the potential incorporation of objective performance criteria into the Company's executive compensation program. Any material changes to our compensation program as a result of this review will be promptly disclosed.

15

* * *

**CEO Compensation**

* * *

Because of Mr. McClendon's unique role as co-founder of the Company, he is the only executive officer with the opportunity to participate as a working interest owner in the oil and natural gas wells that the Company drills.... The FWPP fosters and promotes the development and execution of the Company's business by : (a) retaining and motivating our chief executive officer who co-founded the Company; (b) *aligning the financial rewards and risks of Mr. McClendon with the Company more effectively and directly than other performance incentive programs maintained by many of the Company's peers; and (c) imposing on Mr. McClendon the same risks incurred by the Company in its exploration and production operations*. The Compensation Committee reviews Mr. McClendon's participation in the FWPP on a semi-annual basis and annually adjusts the acreage costs charged to Mr. McClendon to ensure he reimburses the Company for such costs.

* * *

**Policy on Transactions with Related Persons**

The Company has adopted a written policy and procedures for the Audit Committee's review of any transaction, arrangement or relationship or series of similar transactions, arrangements or relationships (including any indebtedness or guarantee of indebtedness) in which (1) the aggregate amount involved will or may be expected to exceed $100,000 in any calendar year, (2) the Company is a participant, and (3) its directors, executive officers, and greater than 5% shareholders and their immediate family members have or will have a direct or indirect interest (other than solely as a result of being a director or beneficially owning less than 10% of the equity of another entity, excluding a partnership). *The Audit Committee approves or ratifies only those transactions that it determines in good faith are in, or are not inconsistent with, the best interests of the Company and its shareholders*. Each of the related person transactions described below has been approved or ratified in accordance with this policy.

In determining whether to approve or ratify a transaction, the Audit Committee takes into account the factors it deems appropriate, which may include, among others, the benefits to the Company, the availability of other sources for comparable products or services, *the impact on a director's independence in the*

16

**event the related person is a director**, **and the extent of the related person's interest in the transaction**. The policy also provides for the delegation of its authority to the chairman of the Audit Committee for any related person transaction requiring pre-approval or ratification between meetings of the Audit Committee.

**The Audit Committee reviews and assesses ongoing relationships with a related person on at least an annual basis to see that they are in compliance with the policy and remain appropriate**. The Audit Committee has reviewed and pre-approved certain transactions even if the amount involved exceeds $100,000. Transactions that have standing pre-approval under the policy include the Company's employment of executive officers and immediate family members if the Compensation Committee has approved the person's compensation, joint operating agreement services if the related person or the Company is subject to the same terms applicable to all working interest owners, and Mr. McClendon's participation in the FWPP (which is overseen by the Compensation Committee).

**Founder Well Participation Program**

… As discussed in "Compensation Discussion and Analysis," the Company believes the FWPP fosters and promotes the development and execution of the Company's business.

\* \* \*

The right to participate in the FWPP can only be assigned by Mr. McClendon to an affiliate designated as such in accordance with the FWPP.

\* \* \*

From January 1, 2007 to December 31, 2007, the Company billed Mr. McClendon $177.7 million for his share of leasehold, drilling, completing, equipping and operating costs… (Emphasis added).

39.     During the time since the Company's IPO, in addition to his sizable interests in the FWPP, McClendon had amassed substantial holdings in Chesapeake stock.  As of September 30, 2008, McClendon owned approximately 33.5 million shares, or more than 5% of the Company's stock.  At their peak in July 2008, McClendon's Chesapeake stock holdings were worth over $2.3 billion.  However, by Friday October 10, 2008, as the financial crisis roiled U.S. markets,

Chesapeake shares closed at $16.52 per share, down 43% for the week and down well 75% since their July 2008 peak of $69.40 per share.

40.     McClendon had purchased much of his stock on margin.   As a result, as Chesapeake shares dropped, McClendon was forced to sell nearly all of his holdings to meet his enormous debt obligations.   As reported by an October 15, 2008 *Fort Worth Star Telegram* article:

> Let's hope that Aubrey McClendon doesn't run his company, Chesapeake Energy, the way he runs his portfolio.
>
> Last week, McClendon was forced to sell nearly all his shares of Chesapeake just as the stock price was cratering. The chief executive, who has bragged about buying shares and rarely selling, blamed "the extraordinary circumstances of the worldwide financial crisis."
>
> He should have blamed himself.
>
> McClendon bet the farm on company stock and, much worse, borrowed hundreds of millions of dollars to do it. If he hadn't been so highly leveraged - heard of that problem recently? - he might have waited out the slump.
>
> * * *
>
> Dozens of other executives also borrowed against their holdings to buy stock or other assets, only to see the value of their collateral plummet. But McClendon stands apart, because he put almost all his Chesapeake shares on the line - and lost them.
>
> "I've not seen many examples of executives putting up that much money and that great a percentage at the same time," says Ben Silverman, director of research at Insiderscore.com, a service that tracks trading by insiders.
>
> * * *
>
> Even early this year, long before natural gas prices tumbled, McClendon s big bet was risky. The natural gas business is known for severe price swings, and the stock market has been jittery since mid-2007, yet he pledged almost his entire stake - and borrowed to do it.

He spent more than $200 million to buy shares in the open market in the past 12 months, continuing to buy while the market was falling. He spent more than $55 million on Chesapeake shares in May, $12 million in June and $43 million in July - and paid more than $50 a share during those months.

In hindsight, it was a reckless wager, costing him much of his personal fortune and raising questions about his business judgment. He may be a true believer in Chesapeake and natural gas, but how do you keep that enthusiasm from distorting his calls as an executive?

* * *

A big personal investment demonstrates the CEO s commitment and aligns his interests with shareholders. McClendon got into trouble with his margin loans, a practice that s discouraged at many companies.

"We love for CEOs to have a significant share of the company, but this was simply a bad business practice," said Brian Bruce, director of the alternative investment center at Southern Methodist University.

If McClendon wanted a bigger stake in Chesapeake, Bruce says he should have sold a vacation house or another asset, and simply paid cash for the shares. Then if the stock went south, he could have just held on, rather than selling at the bottom - and contributing to the price s downward spiral at the same time.

Price says that McClendon s personal investments are diversified and that his huge stock losses have had no impact on the company itself. But McClendon and Chesapeake are so intertwined - and he nurtures the maverick, risk-taking culture - that any harm to McClendon s reputation may spill over to the company as well.

"He's lost his luster, no question," analyst Dan McSpirit told The Wall Street Journal.

41.     An October 20, 2008, *Barrons* published an article reporting that:

In his postsale statement, McClendon indicated that he "frequently purchased additional shares of stock on margin as an expression of my complete confidence in the value of the company's strategy and assets."

That's information that could have proved useful to investors prior to the selloff, according to University of Michigan finance professor Nejat Seyhun. "Buying on margin means the top executive is especially enthusiastic because the gains and losses are going to be magnified," he says.

19

Still, Seyhun adds that the transactions raise reasonable questions, as well. "What sort of risk management would you predict him to have for the shareholders," he says, noting McClendon's significant loss of equity.

42.     McClendon's large sale of Chesapeake shares further drove down the price of the stock and led to multiple shareholder lawsuits.  The suits were ultimately successful in forcing McClendon to make a payment to the Company and imposing new corporate governance provisions designed to curtail these types of speculative stock transactions in Chesapeake stock by Company executives.

43.     On March 2, 2009, the Company filed its annual report for 2008 on Form 10-K with the SEC disclosing that as of December 31, 2008, the Company had long-term indebtedness of approximately $14.184 billion, representing 43% of the Company's total book capitalization at that date.  The 10-K also disclosed:

**Disclosures About Effects of Transactions with Related Parties**

* * *

***On December 31, 2008, we entered into a new five-year employment agreement with Mr. McClendon that contained a one-time well cost incentive award to him . The total cost of the award to Chesapeake was $75 million plus employment taxes in the amount of approximately $1 million***. We will recognize the incentive award as general and administrative expense over the five-year vesting period for the clawback described below, resulting in an expense of approximately $15 million per year beginning in 2009. In addition to state and federal income tax withholding, similar employment taxes were imposed on Mr. McClendon and withheld from the award. The net incentive award of approximately $44 million can only be applied against costs attributable to interests in company wells acquired by Mr. McClendon or his affiliates under the FWPP. The incentive award is subject to a clawback if, during the initial five-year term of the employment agreement, Mr. McClendon resigns from the company or is terminated for cause by the company. Upon receipt of the company's monthly invoice for joint interest billings in mid-January 2009, Mr. McClendon elected to apply approximately $19 million of the drilling credit against his December 2008 FWPP joint interest billings , leaving $25 million available as a credit against future billings. Based on our

20

current development plans and Mr. McClendon's election under the FWPP to participate with a 2.5% working interest during 2009, the well costs under the FWPP are expected to exceed the amount of the entire FWPP credit in early 2009. (Emphasis added).

44.     After the Company filed its Preliminary Proxy in advance of the 2009 meeting of shareholders on April, 20, 2009, investors reacted angrily to certain revelations contained therein. Among other things, the Proxy disclosed:

**Compensation Committee**

The Compensation Committee is responsible for establishing the Company's compensation policies and monitoring the implementation of the Company's compensation system for its executives. ***The Committee's objective is to develop an executive compensation system that encourages both short-term and long-term performance aligned with shareholders' interests and is competitive with the Company's peers***.

\* \* \*

Executive Officer Compensation. Messrs. McClendon, Rowland and Dixon are responsible for analyzing, developing and recommending base salary adjustments, cash bonuses and restricted stock awards with respect to the executive officers, ***including themselves***, for review, discussion and approval by the Compensation Committee at its regularly scheduled meetings in June and December of each year.

\* \* \*

Because of Mr. McClendon's unique role as co-founder of the Company, he is the only executive officer with the opportunity to participate as a working interest owner in the natural gas and oil wells that the Company drills. The FWPP fosters and promotes the development and execution of the Company's business by: (a) retaining and motivating our chief executive officer who co-founded the Company; (b) ***aligning the financial rewards and risks of Mr. McClendon with the Company more effectively and directly than other performance incentive programs maintained by many of the Company's peers; and (c) imposing on Mr. McClendon the same risks incurred by the Company in its exploration and production operations***…

*Special Incentive Compensation*. On December 31, 2008, the Company entered into a new five-year employment agreement with Mr. McClendon. The agreement recognized his leadership role in completing the four transactions in 2008 (

discussed above under "2008 in Review" and detailed below) that were exceptionally advantageous to the Company and its shareholders, further aligned his long-term financial interests with those of the Company and its shareholders and obtained his long-term commitment to remain in his position as CEO. In addition to the cap on cash salary and bonus compensation described above, Mr. McClendon's employment agreement includes the following provisions:

- A one-time $75 million well cost incentive award that, after reduction by state and federal withholding taxes, was structured as a net credit against future billings from the Company for well costs owed by Mr. McClendon under the FWPP, with a five-year clawback;

- A five-year employment commitment by Mr. McClendon;

- An extension of the non-competition period with respect to certain terminations by the Company; and

- A reduced stock holding requirement during 2009.

* * *

*Rationale for Special Incentive Compensation*

* * *

The Compensation Committee further determined that an award to Mr. McClendon in the form of a drilling credit not only rewarded him for his role in the Company's successful 2008 transactions*, but also served to align his economic interests with those of the Company*. Under the terms of the employment agreement, Mr. McClendon and his affiliates are required to use the FWPP Credit to invest in the Company's drilling program in accordance with the FWPP, thereby exposing him to the same risks and benefits that accrue to the Company from its drilling program.

* * *

**Policy on Transactions with Related Persons**

The Company has adopted a written policy and procedures for the Audit Committee's review of any transaction, arrangement or relationship or series of similar transactions, arrangements or relationships (including any indebtedness or guarantee of indebtedness) in which (1) the aggregate amount involved will or may be expected to exceed $100,000 in any calendar year, (2) the Company is a

22

participant, and (3) its directors, executive officers, and greater than 5% shareholders and their immediate family members have or will have a direct or indirect interest (other than solely as a result of being a director or beneficially owning less than 10% of the equity of another entity, excluding a partnership). *The Audit Committee approves or ratifies only those transactions that it determines in good faith are in, or are not inconsistent with, the best interests of the Company and its shareholders*.

In determining whether to approve or ratify a transaction, the Audit Committee takes into account the factors it deems appropriate, which may include, among others, the benefits to the Company, the availability of other sources for comparable products or services, *the impact on a director's independence in the event the related person is a director, and the extent of the related person's interest in the transaction*. The policy also provides for the delegation of its authority to the chairman of the Audit Committee for any related person transaction requiring pre-approval or ratification between meetings of the Audit Committee.

* * *

### Founder Well Participation Program

* * *

*The right to participate in the FWPP can only be assigned by Mr. McClendon to an affiliate designated as such in accordance with the FWPP*.

* * *

Mr. McClendon's FWPP interests are his personal assets and the Company does not restrict sales or other dispositions or financing transactions involving FWPP interests.

* * *

### Other Relationships and Transactions

*The Audit Committee has approved or ratified the transactions described below in accordance with its policy on transactions with related persons*.

*In December 2008, the Company purchased an extensive collection of historical maps of the American Southwest, together with certain books, watercolors and photographs, from Mr. McClendon for $12.1 million*, which represented his cost

. A dealer who had assisted Mr. McClendon in acquiring this collection over a period of six years advised the Company that the replacement value of the collection in December 2008 exceeded the purchase price by more than $8 million. The maps and other art work acquired have been displayed at the Company's offices for a number of years. The Board of Directors authorized the transaction following review and approval by the Audit Committee and required that the Company's purchase price be applied as a credit to Mr. McClendon's future FWPP costs.

In 2008, the Company became a founding sponsor of the Oklahoma City Thunder, a National Basketball Association franchise owned and operated by The Professional Basketball Club, LLC ("PBC"). ***Mr. McClendon has a 19.2% equity interest in and is a non-management member of the PBC***. The Company paid $ 3,495,525 in 2008 and $1,165,175 in 2009 pursuant to its sponsorship agreement for the Oklahoma City Thunder's 2008-2009 season….

In 2008, the Company paid approximately $177,150 for food and beverage catering services to Deep Fork Catering, an affiliate of the Deep Fork Grill, an Oklahoma City restaurant located close to the Company's headquarter campus. ***Mr . McClendon owns 49.7% of the Deep Fork Grill***.  (Emphasis added).

45.	On April 28, 2009, *The Wall Street Journal* reported:

Chesapeake Energy Corp. and its directors are under fire from shareholders for paying Chairman and Chief Executive Aubrey McClendon $112 million last year even as the company's stock price tumbled.

The compensation package, one of the largest for any corporate executive last year , ***included a one-time $75 million bonus***, a $975,000 base salary, and $32.7 million in stock, according to the company's proxy statement.

***Chesapeake, one of the biggest U.S. producers of natural gas, also disclosed several transactions involving Mr. McClendon or companies in which he has an interest, including a deal to buy Mr. McClendon's collection of maps and artwork for $12.1 million.***

***"I have never seen a more shameful document than the Chesapeake proxy statement,"*** investor Jeffrey Bronchick wrote in a letter to Chesapeake's board. ***"If I could reduce it to one page, I would frame and hang it on my office wall as a near perfect illustration of the complete collapse of appropriate corporate governance."***

* * *

Another shareholder, the Louisiana Police Employee Retirement System, asked an Oklahoma state court last month to force Chesapeake to turn over records of its internal deliberations about Mr. McClendon's compensation.

Marc Gross, the group's attorney, said the filing was a first step toward a possible lawsuit accusing Chesapeake's board of breaching its fiduciary responsibility to Chesapeake's shareholders.

Until last year, Mr. McClendon was one of Chesapeake's largest shareholders. But in October, the company's sinking stock price forced him to sell 31.5 million shares , or 94% of his holdings, to meet a call to increase the margin related to loans he got to buy the stock.

In December, Mr. McClendon signed the new five-year contract, which capped his salary and cash bonuses and temporarily eased stock-ownership rules that had required him to own roughly $14 million in Chesapeake stock.

The contract also granted Mr. McClendon a one-time $75 million bonus to help cover expenses related to his 2.5% ownership stake in the company's wells -- costs he formerly paid on his own.

***Mr. Gross, the police pension fund attorney, called the bonus a "bailout" designed to help Mr. McClendon out of personal financial difficulties***.

* * *

Richard Jarvis, chief investment officer for McCarthy Group Advisors LLC, a Nebraska investment firm that owns 111,000 Chesapeake shares, wrote in an email that his firm tries to invest in companies in which management's interests are aligned with those of shareholders, and that those principles had "***clearly been violated***" at Chesapeake.  (Emphasis added).

46.     Upon information and belief, although not publicly disclosed until years later, in June 2009, McClendon entered an agreement with Union Bank under which he was able to borrow up to $225 million by pledging his share of the wells he had obtained in the FWPP as collateral.

47.     On March 1, 2010, the Company filed its annual report for 2009 on Form 10-K with the SEC and disclosed that as of December 31, 2009 the Company had $12.2 billion in long

term debt and $12.3 billion total equity.

**Related Party Transactions**

As of December 31, 2009, we had accrued accounts receivable from our CEO, Aubrey K. McClendon, of $14 million representing joint interest billings from December 2009 which were invoiced and timely paid in January 2010

48.    On April 30, 2010, the Company filed its definitive Proxy Statement with the SEC

in advance of the 2010 meeting of shareholders.  The Proxy disclosed, among other things, that:

**Compensation Committee**

The Compensation Committee is responsible for establishing the Company's compensation program and overseeing the implementation of the Company's compensation system for its executives. The Committee's objective is to develop an executive compensation system that encourages both short-term and long-term performance aligned with shareholders' interests and is competitive with the Company's peers.

\* \* \*

Executive Officer Compensation. Messrs. McClendon, Rowland and Dixon are responsible for analyzing, developing and recommending base salary adjustments, cash bonuses and restricted stock awards with respect to the executive officers, ***including themselves***, for review, discussion and approval by the Compensation Committee at its regularly scheduled meetings in June and December of each year.

\* \* \*

**Executive Compensation**

\* \* \*

**Compensation Objectives and Process**

When we set compensation, our objectives are to:

- attract, retain and motivate employees with the competence, knowledge and experience to promote the growth and profitability of the Company;

- ***encourage both short-term and long-term performance that is aligned with our shareholders' interests***;

26

- pay for performance—that is, a majority of an executive officer's total compensation is a function of individual and corporate performance results; and

- ***ensure that performance-based compensation does not encourage excessive risk taking***.

\* \* \*

## Policy on Transactions with Related Persons

The Company has adopted a written policy and procedures for the Audit Committee's review of any transaction, arrangement or relationship or series of similar transactions, arrangements or relationships (including any indebtedness or guarantee of indebtedness) in which (1) the aggregate amount involved will or may be expected to exceed $100,000 in any calendar year, (2) the Company is a participant, and (3) its directors, executive officers, and greater than 5% shareholders and their immediate family members have or will have a direct or indirect interest (other than solely as a result of being a director or beneficially owning less than 10% of the equity of another entity, excluding a partnership). ***The Audit Committee approves or ratifies only those transactions that it determines in good faith are in, or are not inconsistent with, the best interests of the Company and its shareholders***.

In determining whether to approve or ratify a transaction, the Audit Committee takes into account the factors it deems appropriate, which may include, among others, ***the benefits to the Company***, the availability of other sources for comparable products or services, ***the impact on a director's independence in the event the related person is a director, and the extent of the related person's interest in the transaction***…

\* \* \*

## Founder Well Participation Program

As discussed in "Executive Compensation— Compensation Discussion and Analysis," the Company believes the FWPP fosters and promotes the development and execution of the Company's business.

\* \* \*

The right to participate in the FWPP can only be assigned by Mr. McClendon to an

27

affiliate designated as such in accordance with the FWPP.

* * *

**Other Relationships and Transactions**

The Company is a founding sponsor of the Oklahoma City Thunder, a National Basketball Association franchise owned and operated by The Professional Basketball Club, LLC ("PBC"). Mr. McClendon has a 19.2% equity interest in and is a non-management member of the PBC. The Company paid $3,819,948 in 2009 and $1,273,317 in 2010 pursuant to its sponsorship agreement for the Oklahoma City Thunder's 2009-2010 regular season and will pay an additional $267,588 in connection with home playoff games in April 2010.  (Emphasis added).

49.     Again, although not publicly disclosed for nearly two years, in December 2010, McClendon borrowed $375 million from TCW Asset Management using his FWPP stakes as collateral.

50.     On March 1, 2011, the Company filed its annual report for 2010 on Form 10-K with the SEC and disclosed that as of December 31, 2010 it had long-term indebtedness of approximately $12.6 billion.  The 10-K additionally disclosed:

> As of December 31, 2010, we had accrued accounts receivable from our Chief Executive Officer, Aubrey K. McClendon, of $30 million representing joint interest billings from December 2010 which were invoiced and timely paid in January 2011
> .

51.     On April 29, 2011, the Company filed its definitive Proxy Statement with SEC in advance of the 2011 meeting of shareholders.  Among other things, the Proxy disclosed:

**Board Role in Risk Oversight**

Our Compensation Committee does not believe our compensation programs encourage excessive or inappropriate risk taking for the following reasons:

- Our employees receive both fixed and variable compensation. The fixed (salary) portion provides a steady income regardless of the Company's stock performance, which allows employees to focus on the Company's business without an excessive focus on the Company's stock price.

- We utilize restricted stock awards, rather than stock options, as variable compensation in recognition of employee and corporate performance. Our restricted stock awards typically vest over four years, which discourages short-term risk taking.
- Our stock ownership guidelines encourage our executives to maintain a long-term perspective.
- Our prohibition on derivative or speculative transactions involving Company stock by executive officers up to their minimum stock ownership guidelines reinforces the alignment of our executives' long-term interests with those of our shareholders.
- Our compensation programs have been in place for many years and we have seen no evidence that they encourage excessive risk taking.
- Essentially all of our employees participate in our compensation programs regardless of business unit, which encourages consistent behavior across the Company.

**Compensation Committee**:

The Compensation Committee is responsible for establishing the Company's compensation program and overseeing the implementation of the Company's compensation system for its executives. ***The Committee's objective is to develop an executive compensation system that encourages both short-term and long-term performance aligned with shareholders' interests and is competitive with the Company's peers***.

\* \* \*

*Executive Officer Compensation*. Messrs. McClendon, Dixon and Dell'Osso are responsible, in conjunction with the semi-annual evaluation of the Company's other employees, for developing recommended base salary adjustments, cash bonuses and restricted stock awards for the executive officers, ***including themselves***, for the Compensation Committee to review, discuss and vote on during its regularly scheduled meetings in June and December of each year.

\* \* \*

**Relationship between Compensation Program and Risk**

Our Compensation Committee does not believe our compensation programs encourage excessive or inappropriate risk taking for the reasons described in detail above on page 16 under "Corporate Governance—Board Role in Risk Oversight".

\* \* \*

29

**Policy on Transactions with Related Persons**

The Company has adopted a written policy and procedures for the Audit Committee's review of any transaction, arrangement or relationship or series of similar transactions, arrangements or relationships (including any indebtedness or guarantee of indebtedness) in which (1) the aggregate amount involved will or may be expected to exceed $0.1 million in any calendar year, (2) the Company is a participant, and (3) its directors, executive officers, and greater than 5% shareholders and their immediate family members have or will have a direct or indirect interest (other than solely as a result of being a director or beneficially owning less than 10% of the equity of another entity, excluding a partnership). *The Audit Committee approves or ratifies only those transactions that it determines in good faith are in, or are not inconsistent with, the best interests of the Company and its shareholders*.

In determining whether to approve or ratify a transaction, the Audit Committee takes into account the factors it deems appropriate, which may include, among others, the benefits to the Company, the availability of other sources for comparable products or services, *the impact on a director's independence in the event the related person is a director*, and *the extent of the related person's interest in the transaction*. The policy also delegates authority to the chairman of the Audit Committee to act on any related person transaction requiring pre-approval or ratification between meetings of the Audit Committee.

The Audit Committee reviews and assesses ongoing relationships with a related person on at least an annual basis to consider whether they continue to be in compliance with the policy and remain appropriate. The Audit Committee has reviewed and pre-approved certain transactions, including (i) the Company's employment of executive officers and immediate family members of executive officers, directors and more than 5% shareholders if the Compensation Committee has approved the person's compensation; (ii) operator services provided by a related person or the Company if pursuant to the same terms applicable to all working interest or other owners; and (iii) Mr. McClendon's participation in the FWPP (which is overseen by the Compensation Committee). The Audit Committee has reviewed and approved the transactions with the Oklahoma City Thunder and Frac Tech Holdings, LLC described below in accordance with its policy on transactions with related persons.

**Oklahoma City Thunder**

In 2008, the Company became a founding sponsor of the Oklahoma City Thunder, a National Basketball Association franchise owned and operated by The Professional Basketball Club, LLC ("PBC"). Mr. McClendon has a 19.2% equity

interest in and is a non-management member of the PBC. Pursuant to the Company's sponsorship agreement with the Oklahoma City Thunder, the Company paid approximately $0.4 million in connection with 2010 home playoff games and approximately $5.5 million in connection with the 2010-2011 regular season home games.

\* \* \*

**Founder Well Participation Program**

… As discussed in "*Executive Compensation—Compensation Discussion and Analysis—CEO Compensation in 2010—Founder Well Participation Program*", ***the Company believes the FWPP fosters and promotes the development and execution of the Company's business by aligning the interests of the remaining founder and the Company***.

\* \* \*

Mr. McClendon participates in the FWPP through entities in which all equity interests are owned solely by Mr. McClendon and his immediate family members as approved by the Compensation Committee in accordance with the FWPP.

\* \* \*

Mr. McClendon's interests are his personal assets and the FWPP does not restrict sales, other dispositions or financing transactions involving FWPP interests previously acquired from the Company. From time to time, Mr. McClendon has sold FWPP interests in conjunction with sales by the Company of its interests in the same properties, and the proceeds related to the properties have been allocated between Mr. McClendon and the Company based on their respective ownership interests. As a condition to the sale of the Company's Fayetteville Shale assets completed on March 31, 2011, Mr. McClendon's affiliates sold the FWPP interests they held in the Fayetteville Shale on the same terms as those that applied to the Company's developed producing properties included in the sale. In connection with the transaction, Mr. McClendon has agreed to reimburse the Company for a portion of the transaction costs incurred by the Company, the amount to be determined when post-closing adjustments have been made. (Emphasis added).

52.     On November 4, 2011, the Company filed a Form 8-K with the SEC disclosing

that:

On November 2, 2011, the Company completed the sale to ***EIG Global Energy Partners*** of $500 million of perpetual preferred shares of a newly formed entity,

CHK Utica, L.L.C.  CHK Utica is an unrestricted subsidiary of the Company that owns approximately 700,000 net leasehold acres within an area of mutual interest in the Utica Shale play in 13 counties primarily in eastern Ohio.  The Company has retained all the common interests in CHK Utica.  (Emphasis added).

53.     On December 8, 2011, the Company filed a Form 8-K with the SEC and disclosed:

On December 2, 2011, the Company completed the sale of $750 million of perpetual preferred shares of a newly formed entity, CHK Utica, L.L.C.  CHK Utica is an unrestricted subsidiary of the Company that owns approximately 700, 000 net leasehold acres within an area of mutual interest in the Utica Shale play in 13 counties primarily in eastern Ohio.  The Company has retained all the common interests in CHK Utica.

This closing completes a financial transaction led by *EIG Global Energy Partners* ("EIG") and results in total proceeds of $1.25 billion from sales of CHK Utica preferred shares. As previously announced on November 3, 2011, EIG purchased $500 million of perpetual preferred shares in CHK Utica.  (Emphasis added).

54.     In January 2012, McClendon borrowed $500 million from a unit of EIG Global Energy Partners ("EIG") the same entity mentioned in Chesapeake's November 4, 2011 and December 8, 2011 Forms 8-K, again McClendon used his FWPP stakes as collateral,

55.     On February 29, 2012, the Company filed its annual report for 2011 on Form 10-K with the SEC and disclosed, among other things that as of December 31, 2011, the Company had long-term indebtedness of approximately $10.6 billion, representing 38% of Chesapeake's total book capitalization.  Additionally, among other things, the 10-K disclosed:

**Disclosures About Effects of Transactions with Related Parties**

*Chief Executive Officer*

As of December 31, 2011 and 2010, we had accrued accounts receivable from our Chief Executive Officer, Aubrey K. McClendon, of $45 million and $30 million, respectively, representing joint interest billings from December 2011 and 2010.

* * *

Pursuant to a court-approved litigation settlement with certain plaintiff

32

shareholders under Litigation in Item 3 of this report, the sale of an antique map collection that occurred in December 2008 between Mr. McClendon and the Company will be rescinded. Mr. McClendon will pay the Company approximately $12 million plus interest, and the Company will reconvey the map collection to Mr. McClendon. The transaction is scheduled to be completed not later than 30 days after entry of a final non-appealable judgment.

56.     On April 9, 2012, the Company issued a press release announcing:

Chesapeake Energy Corporation (NYSE:CHK) today announced three oil and gas asset monetization transactions for total proceeds of approximately $2.6 billion in cash.

Chesapeake has completed the sale of preferred shares of a newly formed unrestricted, non-guarantor consolidated subsidiary, CHK Cleveland Tonkawa, L. L.C. (CHK C-T), and a 3.75% overriding royalty interest in the first 1,000 new net wells to be drilled on CHK C-T leasehold and certain wells contributed at closing for proceeds of $1.25 billion. The purchasing investment group was led by GSO Capital Partners LP, an affiliate of the Blackstone Group (NYSE:BX), and included TPG Capital, Magnetar Capital and *EIG Global Energy Partners*. ( Emphasis added).

57.     On April 18, 2012, Reuters reported that McClendon's personal dealings with EIG , which now appear to go as far back as 2009, were discussed in minutes of a February 2011 meeting of the New Mexico Investment Counsel and EIG's Chief Operating Officer, Randall Wade.  The article reported in part:

"In fall 2008, Mr. McClendon didn't have liquidity to participate in the (well) program in 2009, at which point EIG entered into discussions with him" and ultimately formed a special purpose vehicle called Larchmont Resources, Wade said.

*Through Larchmont, EIG acquired the rights to all of McClendon's well stakes for 2009 and 2010. EIG then set up a new special purpose vehicle - Jamestown Resources - to control McClendon's well shares in 2011, with rights to 2012, Wade said*.

EIG's investments have been extremely profitable. "EIG sweeps 100 percent of the cash flow generated by those projects until EIG has gotten all of its money back plus a 13 percent realized return," Wade told New Mexico investors. EIG also gets a 42 percent cut of McClendon's share of the well profits "in perpetuity," he said.  (

Emphasis added).

58.     On Friday, April 20, 2012, *The Wall Street Journal* published an article titled "For Chesapeake's CEO, A Complex Web of Loans", which reported in part:

> **Forms controlled by Aubrey McClendon… were in debt to a private equity group for as much as $1.4 billion while Chesapeake was negotiating with the same firm to sell it hundreds of millions of dollars of assets**.
>
> According to documents reviewed by The Wall Street Journal and a person familiar with the matter, an entity created by Mr. McClendon received a loan of up to $1 billion from an affiliate of EIG Global Energy Partners last November, on top of an earlier loan of $375 million.   The November loan was to Jamestown Resources LLC, which lists Mr. McClendon as president and shares an address with Chesapeake in Oklahoma City, Okla.
>
> Earlier in November, EIG bought $500 million in Chesapeake assets and in December led a group of private firms that bought an additional $750 million, the company announced at the time.   Earlier this month, EIG was again part of a private-equity group that purchased a stake in a Chesapeake subsidiary for $1.25 billion.
>
> Mr. McClendon used loans from EIG to pay for his participation in a controversial company program that gives him the right to benefit from every oil and gas well Chesapeake drills, but requires him to contribute to the well costs…
>
> \* \* \*
>
> News of the loans, and the fact that they were made by a private-equity firm that was also doing deals with Chesapeake, has raised concerns with shareholders about how well the company is monitoring and disclosing the financial activities of Mr. McClendon.
>
> "This sounds like a major conflict of interest," says Michael Passoff, chief executive of Proxy Impact, which advises institutions on shareholder votes.
>
> \* \* \*
>
> Mr. McClendon's limited liability companies obtained loans of up to $1.375 billion from EIG and a predecessor firm, TCW Asset management Co., starting in 2010, according to public records filed in Texas and Pennsylvania.   The financing package was modified in November 2011, and a mortgage was amended earlier this year to include more properties…

* * *

As the cost of participating has grown, Mr. McClendon turned to private equity groups to help cover his payments, with his 2.5% interest in the Chesapeake wells serving as collateral.  EIG, in a metting with the New Mexico State Investment Council in February 2011 and first cited by Reuters, said it collected all his revenue from the wells until it achieved a 13% annualized return, then takes 42% of the profit.  The other 58% belongs to Mr. McClendon…

* * *

Chesapeake's sale of assets in the Utica shale to EIG last November are part of its continuing effort to raise at least $10 billion to fund its drilling program and pay down debt.

Mark Hanson, an analyst of Morningstar, said he thought that one deal, in which Chesapeake sold Utica acreage to EIG, was an expensive way to secure financing, but thought it made sense because the field was unproven.

But informed of Mr. McClendon's private deal with EIG, he said he would have some doubts about whether there was a quid pro quo.  (Emphasis added).

### DAMAGES TO THE COMPANY

59.     Chesapeake has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.  As a direct and proximate result of the Individual Defendants' conduct, Chesapeake has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

   a.   costs incurred in responding to forthcoming public and private lawsuits;

   b.   costs incurred in compensation and benefits paid to defendants that breached their duties to the Company;

   c.   costs incurred in excessive compensation to McClendon while the Company's share price was falling and he was breaching his duties to the Company;

   d.   costs incurred due to unnecessary and excessive related party transactions

involving McClendon and entities in which McClendon holds an ownership stake;

e.   costs incurred due to mismanagement whereby McClendon's interests were prioritized even when they diverged from those of the Company and its shareholders;

f.   substantial loss of market capital;

g.   the Company's overpayment in transactions with EIG due to McClendon's influence over the Board;

h.   McClendon's usurpation of the Company's opportunity to acquire financing in the limited market for oil and gas credit; and

i.   any fines that are a result of the Company's violations of the federal securities laws.

60.   In addition, Chesapeake's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired. Specifically, it now appears to the investing public that the Company's management is completely subservient to the personal needs McClendon and consistently fails to act in the best interests of Company when McClendon's interests diverge with Chesapeake's. The financial viability of the Company and the motives of management are now in serious doubt.

61.   As a result, these actions have irreparably damaged Chesapeake's corporate image and goodwill. For at least the foreseeable future, Chesapeake will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Chesapeake's ability to raise equity

capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

62.     A pre-suit demand on the Chesapeake Board is futile, and therefore, excused.  This is because despite knowing that the Company's controls over conflicts of interest, CEO compensation, and related party transactions had been deficient in the past, and knowing that a lack of those controls would cause the Company substantial harm, the Individual Defendants breached their fiduciary duties by permitting Chesapeake function without such controls.  In so doing, defendants exposed the Company to severe damage and injury.  Consequently, defendants face a substantial risk of liability for breach of good faith and loyalty, rendering them unable to fairly and objectively evaluate a pre-suit demand.  Thus, demand on the Board is futile, and therefore excused.

63.     The current Board of Chesapeake consists of the following nine Individual Defendants: McClendon, Davidson, Eisbrenner, Hargis, Keating, Maxwell, Miller, Nickles and Simpson.  As detailed below, each of the nine current directors suffers from irreconcilable conflicts of interest arising from: (i) their personal benefit from the disputed transactions ( McClendon); (ii) a personal relationship with McClendon and/or business relationship with Chesapeake (Davidson, Hargis, Keating, Maxwell, Miller, and Nickles); (iii) the substantial likelihood of liability due to a failure to discharge their fiduciary duties over areas of Chesapeake's business for which they were indisputably responsible (Davidson, Eisbrenner, Hargis, Keating, Maxwell, Miller, Nickles, and Simpson), especially with respect to members of the Audit Committee (Davidson, Hargis, and Miller) and the Compensation Committee (Eisbrenner, Keating, and Maxwell); (iv) a business relationship or interest with Chesapeake (Miller and Hargis

); and (v) their personal interest in retaining their substantial compensation and prestige as Board members (the annual average compensation of Chesapeake directors is over $500,000).

### A.   Defendant McClendon Is Clearly Conflicted

64.   Defendant McClendon is primarily employed as the CEO of Chesapeake and is a founder of the Company.  As such, he derives his primary source of income from his employment at the Company and his professional reputation is inextricably bound to his role at Chesapeake. Moreover, McClendon's personal conduct is the source of this litigation.  The allegations detailed herein demonstrate that McClendon has dominated the board of directors for years and continues to do so.  McClendon has repeatedly chosen to prioritize his own personal interests over those of the Company.  Defendant McClendon has failed to take any effective action institute functioning controls over the Company that he is charged with running, and has directly and substantially benefited from the failure to institute those controls.  Due to defendant McClendon's exploitation of this lack of controls in the face of obvious risks, Chesapeake has been seriously damaged.  As result, demand on defendant McClendon is futile.

### B.   Demand is Excused Because Certain Board Members Have Conflicting Personal And Business Relationships With McClendon and Chesapeake

65.   Certain members of the Board are conflicted due to familiar and/or business relationships with McClendon and/or Chesapeake.  These Board members are unable to make an independent and disinterested decision to institute and vigorously prosecute this action against their interests.  Specifically,

a.  Six members of the current Board (Davidson, Hargis, Keating, Maxwell, Miller , and Nickles) were on the Board when it authorized the Company to buy from McClendon the $12.1 million map collection.  The decision to approve the

38

purchase of the map collection could not have possibly been an exercise of business judgment and demonstrates a personal interest in helping McClendon financially at time when his personal finances were in disarray.

b. Defendant Miller is Chairman, President and CEO of National Oilwell Varco, Inc., a supplier of oilfield services, equipment, and components to the oil and natural gas industry.  Chesapeake has had a business relationship with National Oilwell Varco, Inc., having purchased oil field equipment and services from the Company on numerous occasions in the past.

**C.     Demand Is Excused Because The Board Members Are Interested In Retaining Their Lucrative Compensation and Prestige As Board Members**

66.     Demand is excused because in addition to McClendon's extraordinary compensation, the board members all received their own lucrative compensation and other benefits that render demand against them futile.  According to the Company's 2012 Proxy Statement, the full board, rather than the Compensation Committee is responsible for determining the size of quarterly and annual restricted stock grants to the directors.

67.     Further, according to the Company's Proxy Statements, the directors received the following compensation:

a. During 2011 and 2010, Davidson earned a total of approximately $590,426, and $620,438 in cash and stock, respectively.

b. During 2011 and 2010, Eisbrenner earned a total of approximately $561,805, and $248,670 in cash and stock, respectively.

c. During 2011 and 2010, Hargis earned a total of approximately $565,465, and $

580,251 in cash and stock, respectively.

d.   During 2011 and 2010, Keating earned a total of approximately $559,232, and $623,443 in cash and stock, respectively.

e.   During 2011 and 2010, Maxwell earned a total of approximately $386,273, and $467,028 in cash and stock, respectively.

f.   During 2011 and 2010, Miller earned a total of approximately $572,709, and $ 607,949 in cash and stock, respectively.

g.   During 2011 and 2010, Nickles earned a total of approximately $569,341, $ 590,316 in cash and stock, respectively.

h.   During 2011, Simpson earned a total of approximately $647,738 in cash and stock.

68.   Additionally, each non-employee director is permitted to use the Company's aircraft for up to 40 hours of flight time per year, in addition to transit to and from Company functions.

**D.   Demand Is Excused Because All Board Members, Especially Compensation and Audit Committee Members, Face A Substantial Likelihood of Liability On The Claims For Breaches Of Fiduciary Duties**

69.   According to the Company's statement released on its website in response to the April 18, 2012 Reuters article, "[t]he Board of Directors is fully aware of the existence of Mr. McClendon's financing transactions."   Nonetheless, even in the face of the serious conflicts of interest detailed herein, the Board members permitted the financing transactions to continue, permitted Chesapeake to enter into transactions with EIG while EIG was financing McClendon's obligations on a massive scale, and apparently consciously determined not to disclose the nature

of the loans or the identity of the party providing them. As a result, every member of the Board has breached his or her fiduciary duties, and demand upon them is futile.

70.    Defendants Davidson, Hargis, and Miller are members of the Audit Committee. As detailed herein, the Audit Committee of the Board is responsible for, among other things: (i) review of insider and affiliated party transactions and related disclosures; and (ii) determining whether related party transactions are not inconsistent with the best interests of the Company's shareholders. Nonetheless, the Audit Committee failed to manage the business and financial risk caused by repeated and outrageous insider and related transactions that clearly created the need for an inquiry into potential conflicts of interest and disclosure of the potential conflicts. Hargis, who has served as the Vice Chairman of BOKF Financial Corporation, the holding company that operates Bank of Oklahoma, and Miller, who served as the President, Chief Operating Officer, and CEO of National Oilwell Varco, Inc., both know the importance of supervision and monitoring of a Company's business and financial risks. Nonetheless, Miller and Hargis failed to exercise their fiduciary duties in to supervise and monitor with respect to Chesapeake. By such actions, defendants Davidson, Hargis, and Miller breached their duties by failing to sufficiently monitor the Company's business and financial risks. As a result of these defendants' breach of their duties, any demand upon them is futile.

71.    The Compensation Committee is currently comprised of defendants Eisbrenner, Keating, and Maxwell. As detailed herein, the Compensation Committee's purpose is to ensure that executive compensation is aligned with the short-term and long-term interests of the Company's shareholders. Not only did the Compensation Committee utterly fail in this purpose, but, in the wake of the major scandal and litigation following the controversial $75 million

41

payment to McClendon and $12.1 million antique map collection purchase, the Compensation Committee presided over *a compensation system under which McClendon was actually charged with setting components of his own compensation*. Most significantly, however, the Compensation Committee completely failed ensure even the appearance of CEO compensation aligned with shareholder interests, as demonstrated by the following:

a. Under McClendon's financing agreements, his income from his well interests under the FWPP was being used to service the loans, and the interest was being used as collateral for the loans. As a result, McClendon must keep the wells productive at all costs in order to earn the income needed to make his payments. This interest is clearly in conflict with the interests of shareholders which would require that in some instances wells need to be capped, especially in light of the glut of natural gas presently taking place due to the shale boom;

b. Also due to the loans McClendon has taken out under the FWPP, he has been competing directly against his own Company for access to the capital markets without revealing to shareholders that he was doing so; and

c. A large portion of Chesapeake's business is purchasing acreage across the country with potential for natural gas drilling and paying billions to secure the rights to drill. Some of the acreage eventually is drilled upon, and much of the land turns out not to be worth drilling. Because the Company only drills on land that it has a strong belief will be productive of oil and gas, McClendon only participates in the good acreage and does not pay for acreage that is never drilled. As a result, he is guaranteed to achieve a better return than the Company's shareholders because he shares in the good wells while the Company and shareholders front the cost obtaining the land and determining.

72.     It is therefore clear that the Compensation Committee has completely failed to institute a compensation system that aligns the CEO's interests with those of the shareholders. Instead, the Compensation Committee has presided over a compensation system that is easily exploited by an unscrupulous CEO and rife with conflicts of interest.  By such actions, defendants Eisbrenner, Keating, and Maxwell breached their fiduciary duties.  Thus, demand on defendants Eisbrenner, Keating, and Maxwell is futile.

73.     Defendants Nickles and Simpson are members of the Nominating and Corporate Governance Committee.  According to its charter, the Nominating and Corporate Governance Committee of the Board is responsible for, among other things: (i) developing, reviewing and recommending corporate governance principles and making recommendations to the Board regarding governance matters and practices; (ii) overseeing the annual evaluation of the performance and effectiveness of the Board and its committees; (iii) overseeing and evaluating compliance by the Board and management with the Company's corporate guidance principles and its Code of Business Conduct and Ethics.  Nonetheless, the Nominating and Corporate Governance Committee failed to oversee the development and instruction of a system of corporate governance that would expose and halt the most basic of corporate governance problems: conflicts of interest.  By such failure, defendants Nickles and Simpson breached their duties by failing to sufficiently monitor the Company's business and financial risks.  As a result of these defendants' breach of their duties, any demand upon them is futile

### E.     Demand Is Excused Because The Board Members Have Already Exhibited Antipathy Toward Investigating Or Prosecuting The Corporate Wrongdoing

74.     The Individual Defendants have failed to take action against those who are responsible for permitting Chesapeake to function without effective accounting controls, including

themselves.  The Individual Defendants have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks for the corporation for the wrongdoing complained of herein. Specifically, in response to the burgeoning scandal over McClendon's conflicts of interests in the wake of the April 18, 2012 Reuters article excerpted above, the Board members caused the Company to release a statement responding to the article, justifying their inaction in the face of actual knowledge of the financing arrangements, and clearly demonstrating that the minds of the Board members are closed the allegations detailed herein.  The Board members' statement even went so far as to reveal the legal authority they believe absolves them of liability for failing to disclose, prevent, and sufficiently monitor McClendon's conflicts.  Therefore they will not institute the required legal action and/or purge the Board of members that are conflicted and/or implicated in the wrongdoing.  Because seven of the nine Individual Defendants have served on the Chesapeake board together since prior to the 2008 related transaction and CEO compensation problems, they have developed professional relationships, are friends and have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.  Thus, demand on the Board is futile and therefore excused.

75.     The Individual Defendants' decision to deprive Chesapeake of legally sufficient internal controls resulted in the inability to ensure that the Company's compensation and corporate governance procedures were in compliance with applicable internal guidelines, public statements, regulations, and laws.  For years, Chesapeake has been plagued by conflict of interest problems and questionable dealings by its CEO that harm the Company and its shareholders.  The wrongdoing alleged herein is not the product of a rogue employee or a group of such employees,

but a systemic failure of the Board.  Since 2008, when the Board approved a one-time incentive

payment to McClendon of $75 million in a year that the Company's stock had lost nearly 75% of

its value and then *also purchased an antique maps collection from McClendon for $12.1 million*,

the Board members have known that the Company's management has faces credibility problem in

the market.   Even though the Board members knew that the Company would be severely

damaged by further revelations of McClendon's conflicts of interest and the Boards acquiescence

to them, the Board exhibited an intentional and/or reckless failure to exercise oversight of the

Company's corporate governance reporting processes.   Thus, demand on the entire Board is futile

and therefore excused.

76.     As particularized herein, to properly prosecute this lawsuit, Chesapeake directors

would have to sue themselves and the other defendants, requiring them to expose themselves and

their comrades to tens of millions of dollars in civil liability and/or sanctions.  This they will not do

.  A majority of the defendants are exposed to potential liability for operating Chesapeake without

the internal controls over financial reporting that would have detected and prevented material

weaknesses and inaccurate representations detailed herein.   Thus, demand on the Individual

Defendants is futile, and therefore, excused.

77.     The Individual Defendants have benefitted, and will continue to benefit, from the

wrongdoing herein alleged and have engaged in such conduct to preserve their positions of

control and the substantial financial benefit derived thereof, and are incapable of exercising

independent objective judgment in deciding whether to bring this action.  The acts complained of

herein have resulted in substantial economic benefits to McClendon and the members of the Board

– without corresponding recognition or accounting for the correlated liability and risk that

Chesapeake was subject to as a result of its lack of internal controls.   Individual Defendants, through their course of conduct to date, have demonstrated their unwillingness to seek appropriate relief for the overpayment of this compensation once the risk is accounted for and the penalties and costs are reconciled into Chesapeake's balance sheet.   Thus, demand on the Individual Defendants is futile, and therefore, excused.

78.     Chesapeake has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet, the Individual Defendants have not filed any lawsuits against defendants or others who were responsible for the wrongful conduct to attempt to recover for Chesapeake any part of the damages the Company suffered and will suffer thereby.   Thus, demand on the Board is futile, and therefore, excused.

79.     The Chesapeake Board is dominated by directors that are specifically implicated in the wrongdoing: each member is either: (a) CEO; (b) a member of the audit committee; (c) a member of the Compensation Committee; or (d) a member of the Nominating and Corporate Governance Committees.   As a result, the Board is dominated by persons who are specifically implicated in the wrongdoing and therefore cannot be expected to sue themselves.

80.     Chesapeake's officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Petition by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, i.e., monies belonging to the stockholders of Chesapeake.   However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Chesapeake

against these defendants, known as, inter alia, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Chesapeake, there would be no directors' and officers' insurance protection and thus, they will not bring such a suit.   On the other hand, if the suit is brought derivatively, as the action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.   Thus, demand on the Individual Defendants is futile, and therefore, excused.

## COUNT I

### Breach of Fiduciary Duty

81.     Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

82.     Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Chesapeake's business and affairs, particularly with respect to issues so fundamental as corporate governance procedures.

83.     Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company.   Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Chesapeake.

84.     In breach of their fiduciary duties owed to Chesapeake, defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, and failed to properly oversee Chesapeake's business, rendering them personally liable to the Company for breaching their fiduciary duties.

85.     As a direct and proximate result of defendants' breaches of their fiduciary

obligations, Chesapeake has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

### COUNT II

### Abuse of Control

86.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

87.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Chesapeake, for which they are legally responsible.

88.     As a direct and proximate result of defendants' abuse of control, Chesapeake has sustained significant damages.

89.     As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Chesapeake has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

90.     By reason of the foregoing, Chesapeake has been damaged.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.     Declaring that plaintiff may maintain this action on behalf of Chesapeake and that plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Chesapeake;

48

C.     Determining and awarding to Chesapeake the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D.     Directing Chesapeake and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Chesapeake and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.     a provision to permit the shareholders of Chesapeake to nominate at least three candidates for election to the Board;

3.     a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.     Determining and awarding to Chesapeake exemplary damages in an amount necessary to punish Individual Defendants and to make an example of defendants to the community according to proof at trial;

F.     Awarding Chesapeake restitution from defendants, and each of them;

G.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

49

H.      Granting such other and further equitable relief as this Court may deem just and

proper.

## JURY DEMAND

Pursuant to Fed. R.Civ.P. 38(b), Plaintiff demands a trial by jury.

Dated: April 26, 2012

By: s/Steven W. Crow
STEVEN W. CROW, OBA No. 15676
5617 N. Classen Blvd.
Oklahoma City, OK 73118
405-843-0400
405-843-5005 (fax)

ROBERT I. HARWOOD
MATTHEW M. HOUSTON
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
(212) 935-7400

Attorneys for Plaintiff